**LODI MEMORIAL HOSPITAL, Plaintiff,**

v.

**Joseph A. CALIFANO, Secretary, Department of Health, Education and Welfare, Defendant.**

Civ. A. No. 77–1316.

United States District Court, District of Columbia.

May 22, 1978.

John J. Vlahos, Michael A. Duncheon, Hanson, Bridgett, Marcus, Milne & Vlahos, San Francisco, Cal., Mark C. Ellenberg, Cadwalader, Wickersham & Taft, Washington, D. C., for plaintiff.

Robert N. Ford, Civ. Div., Chief Asst. U. S. Atty., Washington, D. C., Diane Moskal, Dept. of HEW, Washington, D. C., for defendant.

## MEMORANDUM AND JUDGMENT

FLANNERY, District Judge.

### I. *Introduction and Background.*

This matter is before the court on cross-motions for summary judgment. Because this case is somewhat complex, involving as it does a dispute over the meaning of certain Medicare regulations, a somewhat lengthy factual background is necessary. Plaintiff is an acute care health facility which is an authorized provider of services to Medicare patients. 42 U.S.C. § 1395cc. The Medicare Program involves basically two types of payments. Under Part A of the program, an authorized hospital such as plaintiff, receives direct payments from the government, 42 U.S.C. § 1395c, for the reasonable and necessary costs, 42 U.S.C. § 1395y(a)(1), of certain defined health care and diagnostic services, 42 U.S.C. § 1395d. Such reimbursements for actual costs which are reasonably and necessarily incurred in the care of a Medicare patient may be paid directly from the government or through an elected financial intermediary, such as Blue Cross. 42 U.S.C. § 1395h. In this case, the payments in issue were made through Blue Cross of Northern California, which makes certain estimated payments during the

course of the year and then adjusts the payments at the end of the year when cost reports are filed and the government repays the intermediary in a lump sum. Part B of the program is a voluntary health insurance program available to persons eligible for Medicare upon payment of a small premium. This is a separate though related program to Part A, and each program is administered out of its own, discrete funds. Part B allows payments for services rendered by other than hospital sources, as, for example, a private physician who bills his patients separately from the hospital. A similar system of private intermediaries is available under this plan. 42 U.S.C. § 1395. These two programs complement each other, and the dispute in this case involves the interplay of these two programs and the payments made thereunder.

Proceeding to the particular facts of this case, plaintiff had been filing its cost reports and receiving its payments as a provider of Medicare services from the Blue Cross of Northern California. Also, since 1957, plaintiff has not run its own radiology department. Rather, plaintiff has leased space on the hospital premises to a private group of radiologists. According to the record of the administrative proceedings in this case, rental payments from the radiologists were, until September 30, 1973, computed as a flat percentage of the gross billings of the radiologists. Thereafter, under the terms of a new ten-year lease, the rental was computed on a cost per square foot of space leased basis. In all other respects, the new and old lease were the same. Plaintiff supplied and paid for all utilities except outside telephone lines. Plaintiff also provided janitorial services, laundry and linen service, and various standard supplies such as needles and gloves at no additional cost. In return, the radiologists paid their rent, provided all the necessary radiology equipment and bore all other costs of running the department. The radiologists billed the hospital patients who used their services separately, but the radiologists were treated in all other respects as if they were members of the hospital staff. It appears that for the years in question, 1970–1974, the rental payments made by the radiologists exceeded the actual costs incurred by the hospital in maintaining the radiology facility. Defendants have deemed this excess to be a profit accruing to the hospital. It is also clear that for the years in question plaintiff treated the radiology center as a "non-reimbursable cost center." In other words, plaintiff never sought any payments from Medicare for any of the costs incurred in connection with the radiology center, even though many Medicare patients used the facility. The record is devoid of any evidence of the extent to which the radiologists included the rental costs for hospital space in their requests for Part B payments when they dealt with Medicare patients in the hospital.

In 1975, Blue Cross of Northern California, the financial intermediary handling payments to plaintiff for the providing of Medicare services, conducted an audit of plaintiff's 1974 and 1973 cost reports. Blue Cross informed plaintiff that it intended to declare an adjustment for those years in consideration of plaintiff's profit from the rent on the radiology center. Blue Cross stated that it intended to deduct an amount equal to the profit times the hospital's percentage of Medicare utilization, resulting in a request that plaintiff repay the government $14,056 for 1973 and $13,760 for 1974. Defendant states that Blue Cross took this action in compliance with H.E.W.'s Provider Reimbursement Manual, HIM–15 § 2108.-5A, which requires the set-off of excess lease revenues against allowable costs of other hospital departments. Blue Cross then proceeded to make similar adjustments for 1970, 1971 and 1972.

Plaintiff naturally took exception to these deductions, and, as provided by 42 U.S.C. § 1395oo(a) (Supp. III, 1973), plaintiff filed for a review of these determinations by the Provider Reimbursement Review Board. The Board found that it did not have jurisdiction to review the determinations regarding the 1970, 1971 and 1972 assessments since the review provisions were applicable only to cost reports filed after June 30, 1973. Pub.L.No. 92–603, Ti-

tle II, § 243(a), 86 Stat. 1420. Plaintiff asserts that this was error, and now makes this its first claim for summary judgment.

As for the 1973 and 1974 adjustments, the Board found in favor of the plaintiff. Upon request of Blue Cross, and pursuant to his discretionary review power, 42 U.S.C. § 1395oo (f)(1) (Supp. IV, 1974), the Secretary granted review of the Board's determination. Before making a final decision, the Secretary consulted with the Bureau of Health Insurance, an office within H.E.W. which has great expertise in these matters but which was not a party to the original proceedings and which submitted no comments during the original proceedings. Although BHI's comments were in writing and were subsequently made a part of the record, plaintiff had no opportunity to rebut or otherwise respond to BHI's comments. Plaintiff, therefore, alleges that it was deprived of due process of law, and this is plaintiff's second ground for summary judgment.

After consultation with BHI, the Secretary issued his final administrative order reversing the Board's decision and reinstating the action taken originally by Blue Cross. Pursuant to 42 U.S.C. § 1395oo (f) plaintiff has exercised its right to judicial review of the Secretary's ruling. Plaintiff contends that the Secretary's judgment is contrary to the Medicare laws, and especially involves an erroneous interpretation of 20 C.F.R. § 405.486 (1977).[1] Plaintiff contends that this interpretation, as embodied in H.E.W.'s Provider Reimbursement Manual, HIM–15 § 2108.5A, is arbitrary and capricious, and that, therefore, plaintiff is entitled to summary judgment. Each of plaintiff's contentions will be discussed separately, and the court shall analyze the procedural questions first.

II. *Review of the 1970, 1971 and 1972 Adjustments.*

 The Medicare program was created by amending the Social Security Act,

which contains its own provisions governing judicial review. Section 205(h) of the Act, codified at 42 U.S.C. § 405(h), is particularly pertinent, and states:

> The findings and decisions of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 41 of Title 28 to recover on any claim arising under this subchapter.

This provision is applicable to the Medicare Act to the same extent that it is applicable to the act creating old-age, disability and survivor benefits, of which act section 405(h) was an original part. *See* 42 U.S.C. § 1395ii (Supp. III, 1973). Since section 405(h) indicates that judicial review is allowed only as provided within the act itself, reviewability of provider benefit decisions under the Medicare Act is totally governed by 42 U.S.C. § 1935oo. *Association of American Medical Colleges v. Califano,* 569 F.2d 101, 106–108 (D.C. Cir. 1977). Plaintiff may not ask this court to assume jurisdiction of this case under 5 U.S.C. §§ 701–706, which are the general judicial review provisions of the Administrative Procedure Act, *Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 983–85, 51 L.Ed.2d 192 (1977), nor under general federal question jurisdiction. *Association of American Medical Colleges v. Califano, supra,* 569 F.2d at 107. Therefore, this court will have jurisdiction of the 1970–72 claims only to the extent that 42 U.S.C. § 1395oo provides for such jurisdiction.

Section 1395oo provides judicial review of any action taken by the Secretary which affirms, modifies or reverses a ruling of the Provider Reimbursement Review Board. The Board was created by Public Law No. 92–603, and originally judicial review could be had only if the Secretary modified or

---

1. It should be noted that in 42 Fed.Reg. 52826, parts of 20 C.F.R. Part 405 were recodified under 42 C.F.R. However, until this recodifica- tion is complete, all references will be to the original sections in 20 C.F.R. Part 405.

reversed a finding of the Board. Pub.L. No. 92–603, Title II § 243(a), 86 Stat. 1420. However, section 243(c) of the act creating the Board and providing review therefrom stated:

The amendments made by this section shall apply with respect to cost reports of providers of services . . . for accounting periods ending on or after June 30, 1973.

When this Act was amended to its present form to allow review even when the Secretary affirmed the Board's decision, the June 30, 1973 date was retained as the cut-off. Pub.L. No. 93–484, § 3, 88 Stat. 1459. Plaintiff argues that a great number of cases, including *Humana of South Carolina, Inc. v. Mathews,* 419 F.Supp. 253 (D.D.C. 1976), have held that jurisdiction to hear claims under the Medicare Act may be found despite this limitation. However, examination of those cases reveals that they all relied on 28 U.S.C. § 1331, on the Administrative Procedure Act, or on both. In light of the recent decision in *Association of American Medical Colleges v. Califano, supra,* plaintiff's arguments lack merit. Jurisdiction in this case is limited by section 1395*oo,* and this court is, therefore, precluded from reviewing the 1970–72 claims.

■ Plaintiff has also argued that since this court does have jurisdiction to hear the 1973 and 1974 claims, this court may exercise pendent jurisdiction over the 1970–72 claims. Although pendent jurisdiction of a federal question has been recognized in a number of cases, those decisions have been limited to situations in which the court sought to avoid decision of a constitutional question by disposing of a statutory claim not otherwise before the court, *Hagans v. Lavine,* 415 U.S. 528, 549–50, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974), or to the special circumstances of federal maritime law, *Romero v. International Terminal Operat-*

*ing Co.,* 358 U.S. 354, 380–81, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959). Neither of those situations are present here. Indeed, to permit pendent jurisdiction of the 1970–72 claims would be to allow plaintiffs to do indirectly what the statute expressly prohibits. Thus, this court has jurisdiction to review the dispositions of the 1973 and 1974 claims only.[2]

III. *Deprivation of Due Process.*

■ Plaintiff's second contention is that it was denied due process when the Secretary solicited advice from the Bureau of Health Insurance and deprived plaintiff of the opportunity to respond to such advice. Defendant argues that the Secretary's ability to solicit such advice is implicit in H.E.W. regulations. Defendant specifically points to 20 C.F.R. § 405.1867, which outlines the sources of the Board's authority:

In exercising its authority to conduct the hearings described herein, the Board must comply with all the provisions of title XVIII of the Act and regulations issued thereunder, as well as rulings issued under the authority of the Commissioner of Social Security . . . . The Board shall afford great weight to interpretative rules, general statements of policy, and rules of agency organization, procedure, or practice established by the Bureau of Health Insurance.

Defendant argues persuasively that the Secretary may look to the Bureau of Health Insurance for guidance in order to determine whether the Review Board has exercised its authority in the manner prescribed by the regulation. Plaintiff knew or should have known of the primary role the Bureau plays in this area, and plaintiff cannot claim prejudice simply because the Secretary was scrupulously fulfilling his review function. Of course, absent this regulation

**2.** The determination that this court has no jurisdiction to review the 1970–72 claims does of course run contrary to the general presumption in favor of judicial review. However, with regard to the Social Security Act and the Medicare Act which amends it, it was Congress' purpose to limit the availability of judicial review in order to prevent courts from being deluged with the multiplicity of complaints which are bound to arise under any social welfare program. *Humana of South Carolina, Inc. v. Mathews,* 419 F.Supp. 253, 256–57 (D.D.C. 1976). Therefore, although this might cause an injustice in the individual case, it was Congress' intent to so limit judicial review of these matters.

defining the Review Board's authority, the situation might have been different. However, that is not the issue before the court at this time. Therefore, plaintiff's due process claim will also be denied.

IV. *Review of the Merits.*

Having disposed of the various procedural arguments presented by the parties, the court may now proceed to consideration of the merits of the Secretary's order reversing the Review Board's decision regarding 1973 and 1974 adjustments.

■ The focus of the dispute in this case is on the interpretation to be given to 20 C.F.R. § 405.486, which states in pertinent part:

(a) *Principle.* Where a hospital-based physician himself bears some or all of the costs of operation of a hospital department and bills his patients directly rather than through the hospital, the reasonable charges for his services recognized under the supplementary medical insurance program will reflect the costs so borne by him. Where all costs are to be borne by the physician, charges heretofore established for such services by agreement between the physician and the hospital may be acceptable as reasonable charges for purposes of the supplementary medical insurance program, but they will require adjustment either upward or downward if the hospital has been bearing a cost significantly greater or less than its share of the proceeds of such charges.

(b) *Billing for physician services.* (1) The objective in determining reasonable charges where the physician bills patients directly is the same as that expressed in § 405.485(a): to bring about as little charge as possible (in the normal case) in the compensation the physician receives for his services in the hospital. Where the physician bills the patient directly, costs of operating the hospital department which are borne by the physician will be reflected in his reasonable charges which are compensable under the supplementary medical insurance program; the hospital will receive reimbursement through the hospital insurance program

for those costs, if any, which it incurs. Where, however, a hospital initially pays some or all of the operating expenses of a hospital department (e. g. pays the salaries of nonprofessional personnel and purchase supplies and equipment), even though subsequently those items and services for which it pays the operating expenses are furnished for the use of the physician in return for an agreed upon payment by the physician to the hospital, such operating costs are reimbursable under the hospital insurance program as hospital costs, and are not to be reflected in the reasonable charges of the physician. Any payments received by the hospital under such an arrangement shall be treated as a reduction of allowable costs of the hospital reimbursable through the hospital insurance program.

It must be remembered that in the present case, plaintiff leases space to the radiology center and pays certain utility costs. The radiology center bills its patients separately from the hospital. Plaintiff has never claimed that any of the costs it incurred in maintaining the radiology center (utility and supply costs, for example) should be reimbursed with Medicare funds. Plaintiff made this clear by indicating the radiology center as a nonreimbursable cost center. Thus plaintiff has never received any Medicare funds for the operation of the radiology center. There is no evidence of the extent to which the individual radiologists received Medicare payments for the costs they incurred in running the center (rent and equipment, for example), and it is undisputed that the individual radiologists may not receive Part B payments for anything but the actual costs of the center. Thus the radiologists could not claim their entire rental payment since some of it went to profit for the hospital. The question is whether the regulation quoted above allows H.E.W. to proceed against plaintiff for an adjustment based not on the actual amounts of overpayments, but on a theory that the physicians must have claimed the full rental (although there is no evidence to that effect) and that the rental payments

made to plaintiff must, therefore, contain some excess Medicare payments, and that, therefore, this "conduit" theory means that H.E.W. may proceed against plaintiff for an estimated overpayment rather than against the individual physicians.

 Defendant argues that this "conduit" theory is correct. Defendant's first premise in making this argument is that since radiology is a service for which a provider of Medicare services can seek reimbursement, it is wrong that such provider chooses not to seek such reimbursement. Defendant relies for support of this proposition on the statement in 20 C.F.R. § 405.486(b)(1), *supra*, that the costs of the hospital department initially paid by the hospital are reimbursable under the hospital insurance program as hospital costs. This would appear to be a forced reading of the regulation, especially when the entire regulatory scheme is studied. Plaintiff's entitlement to any Medicare payments at all is dependent upon plaintiff's filing of a yearly cost report. It is axiomatic that any cost not listed as reimbursable in that cost report would not be included in the amount reimbursed to the plaintiff. Plaintiff in this case has chosen not to treat the costs related to the radiology department as reimbursable, thereby lowering its absolute entitlement to Medicare payments for radiology services. The Secretary's assertion in his order reversing the Review Board that "[h]ospital departments concerned with patient care are not considered nonallowable cost centers" is without support in the regulations. The fact that a hospital may receive reimbursement for certain costs does not mean that it must seek such reimbursement.

Even assuming, however, that defendant's initial premise on the compulsory nature of reimbursable costs is correct, this court must ascertain whether the interpretation of 20 C.F.R. § 405.486 advanced by the government is arbitrary and capricious, and therefore invalid. The government's theory heretofore referred to as the conduit theory, was adopted by the District Court in *Vallejo General Hospital v. Weinberger,* [CCH] Medicare-Medicaid Guide ¶ 28,373 (N.D.Cal.1977), which stated the theory in this manner:

> The radiologist is reimbursed under Part B for his reasonable charges. However, if a hospital leases its radiology department, the hospital's Medicare reimbursement, channeled through the payments of the radiologist can include payments in excess of the hospital's actual costs of serving Medicare beneficiaries. A set off of this excess revenue against the hospital's otherwise reimbursable Medicare costs may be made to insure that only the hospital's reasonable costs of providing services are reimbursed.

*Id.* at 9303–304. That case, like this one, involved the leasing of a radiology department, and also in that case, there was no evidence that any excess payments had been made to the physicians which was then passed on to the hospital.

Plaintiff argues that the absence of proof that any such excess payments were ever made to the radiologists is a fatal flaw in the defendant's position. As support for this position, plaintiff relies on the Fifth Circuit decision in *Dr. John T. MacDonald Foundation, Inc. v. Mathews,* 534 F.2d 633 (5th Cir. 1976), *rehearing denied,* 554 F.2d 714 (1977). That case also dealt with a hospital which leased its radiology department to private physicians under an arrangement almost identical to the one in this case.[3] In *MacDonald,* the Fifth Circuit found that 20 C.F.R. § 405.486, the regulation at issue in this suit, "exists to insure that Medicare does not pay twice for the same operating costs." 534 F.2d 633, 637.

---

**3.** The *MacDonald* case dealt with adjustments for cost periods before 1973. The Fifth Circuit, in a carefully worded opinion denying rehearing in tnat case, 554 F.2d 714 (5th Cir. 1977), held that despite recent Supreme Court decisions, it had jurisdiction to hear cases reviewing adjustments made for cost reports filed before June 30, 1973. *Id.* at 717–18. Although this result is contrary to the conclusion reached by the Court of Appeals in this Circuit, *see Association of American Medical Colleges v. Califano, supra,* 569 F.2d at 108 n. 68, the Fifth Circuit's discussion of the merits still has precedential value and is persuasive.

However, in *MacDonald,* as here, the hospital had never sought reimbursement for the costs incurred in maintaining the radiology facility. In light of this, the *MacDonald* court stated:

But this is not a case where Medicare paid twice. The hospital was never reimbursed for any operating expenses of the radiology department. Therefore, we cannot agree with HEW that § 405.486(1) should be applied to reduce Medicare payments due to Doctors' Hospital. We read "initially pays" in the regulation to describe an outlay by the hospital that predates a "subsequent" leasing arrangement through which the physician assumes the operating costs. Such an initial outlay is a cost for which the hospital is reimbursed by Medicare; then if the subsequent lease payment by the physician reimburses the hospital for the same costs, *that* payment must be deducted from the hospital's allowable costs under the hospital insurance program. Such a deduction properly avoids double reimbursement to the hospital, once by Medicare and again by the physician. But Doctors' Hospital was never reimbursed for any operating costs of the radiology department and should not have to deduct any lease payments made by the physicians.

*Id.* at 637. The court in *MacDonald* went on to find that where H.E.W. suspected that a hospital-based physician had billed his patients for the total cost of his lease payments, which cost included the hospital's profit, H.E.W., under the terms of 20 C.F.R. § 405.486(b)(2) must proceed against the physician for such an overcharge. *Id.* at 638. H.E.W. had argued in that case that subsection (b)(2) was inadequate for such purposes since it did not provide for a differentiation in the actual cost of operating the department and the overhead which was part of the rental payment. To this, the Fifth Circuit responded:

If C.F.R. § 405.486(b)(2) is not an effective check on the payment of excessive overhead as a component of a hospital-based physician's reasonable charges, then the Secretary of H.E.W. must

promulgate a regulation that will correct such excesses rather than torture the sense of those he has. As now written, the regulation does not permit the Secretary to snatch revenue from the radiology department out of the hospital's pocket after the money has left the doctor's hands. Nor may H.E.W. apply C.F.R. § 405.486(b)(1), designed as a safeguard against double reimbursement of the same operating costs, to a hospital which received no reimbursement under the hospital insurance program for the operation of its radiology department. . . We conclude that HEW has abused its discretion in interpreting § 405.486(b)(1) to require a deduction in provider reimbursements.

*Id.* at 639.

Upon examination of the entire regulatory scheme in this area, the Fifth Circuit's analysis is the correct one. The requirement that the hospital be reimbursed for all claimed costs which were actually incurred and which were reasonable does not appear to allow for the consideration of profits generated from other parts of the hospital which were not claimed as reimbursable cost centers. The formula advanced by H.E.W. assumes that because the hospital realized profits on the lease, the radiologists must have claimed the entire lease payment as a reimbursable despite the clear statement in the regulations that only actual cost, not profit, was to be included. Defendant has indicated that its conduit theory, as derived from Provider Reimbursement Manual section 2108.5A, is merely an interpretation of existing regulations. Although other parts of this manual have been deemed interpretative for the purposes of the Administrative Procedure Act, *New Jersey Chapter, Inc. of A.P.T.A. v. Prudential Life Ins. Co.,* 164 U.S.App.D.C. 40, 502 F.2d 500 (1974), *cert. denied* 420 U.S. 1004, 95 S.Ct. 1444, 43 L.Ed.2d 762 (1975) (procedures for determining reasonable charges for private physical therapists), this does not mean that section 2108.5A is similarly proper. It is this court's opinion that section 2108.5A is at variance with current

regulations in this area. As such, the Secretary's actions based on section 2108.5A are an abuse of discretion. There is, of course, nothing to prevent the Secretary from promulgating a regulation which incorporates this conduit theory, so long as the rulemaking process mandated by the Administrative Procedure Act is followed. However, under the present regulations, this court must grant summary judgment for the plaintiff for the 1973 and 1974 claims.