HOSPITAL SAN JORGE,
Plaintiff-Appellant,

v.

SECRETARY OF HEALTH, EDUCA-
TION AND WELFARE,
Defendant-Appellee.

No. 79–1171.

United States Court of Appeals,
First Circuit.

Argued Nov. 6, 1979.

Decided Feb. 20, 1980.

Eduardo Morales Coll, Hato Rey, P. R., for plaintiff-appellant.

Jaclyn C. Taner, Asst. Regional Atty., with whom Julio Morales Sanchez, U. S. Atty., Alberto Tellechea, Asst. U. S. Atty., San Juan, P. R. and Frank V. Smith, III, Acting Regional Atty., New York City, were on brief, for defendant-appellee.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, WYZANSKI, Senior District Judge.*

WYZANSKI, Senior District Judge:

This appeal raises the question whether in seeking reimbursement of its Part A Medicare costs a hospital which has leased its radiology department must apply such portion of the rent which it received from that department as exceeds the hospital's reasonable costs incurred in that department to reduce the hospital's reasonable costs incurred in other departments.

## I. STATUTORY BACKGROUND

Title XVIII of the Social Security Act establishes the "Medicare" health insurance program. 42 U.S.C. § 1395 *et seq.* This program, which provides federal reimbursement for medical care to the aged, has two parts: Part A, providing "hospital insurance" funded out of Social Security taxes, and Part B, a voluntary supplementary medical insurance program primarily covering physicians' services.

A hospital may participate in Part A of the Medicare program as a provider and receive federal payments by filing an agreement with the Secretary of Health, Education, and Welfare (hereafter "the Secretary"). 42 U.S.C. § 1395cc. Sometimes the

* Of the District of Massachusetts, sitting by designation.

Secretary, but usually one of his fiscal intermediaries, reimburses providers for services rendered to Medicare beneficiaries, 42 U.S.C. § 1395h.

The provider submits its bills for services to the intermediary for audit and payment. Then at the end of the fiscal year the provider submits its cost report. 42 CFR § 405.486(b). After analyzing the cost report to determine the reasonable costs of the services which the provider has rendered to program beneficiaries, the intermediary informs the provider, through a written Notice of Program Reimbursement, of the amount of Medicare reimbursement. 42 CFR § 405.1803. If the provider is dissatisfied with the intermediary's decision, and if the amount in controversy is $10,000 or more, it may request a hearing before the Departmental Provider Reimbursement Review Board, 42 U.S.C. § 1395oo(a); 42 CFR § 405.1835.

Within 60 days after a Board decision, the Secretary, on his own motion, may reverse, affirm or modify that decision. 42 U.S.C.

§ 1395oo(f)(1). Upon timely appeal, the district court has jurisdiction to review the final decision of the Board or of the Secretary. *Id.*

Part B is a voluntary health insurance program. An eligible individual may enroll in the program and agree to pay a monthly premium established by the Secretary. The premiums, together with amounts contributed by the federal government, are deposited in the Federal Supplementary Medical Insurance Trust Fund, (hereafter "FSMIT Fund"). After payment of a deductible by the beneficiary, the fund pays 80 percent of the reasonable charge for program services, most of which are rendered by physicians.

Regulations set forth in 42 CFR § 405.840 to § 405.488 govern the source and amount of reimbursement when a hospital-based physician, such as a radiologist, performs services for patients covered by Medicare A or B or both. Of those regulations the one applied by the Secretary in this case is codified as 42 CFR § 405.486 [1] which the Secretary interpreted in HEW's Provider

---

1. § 405.486 Effect of physician's assumption of operating costs.

(a) *Principle.* Where a hospital-based physician himself bears some or all of the costs of operation of a hospital department and bills his patients directly rather than through the hospital, the reasonable charges for his services recognized under the supplementary medical insurance program will reflect the costs so borne by him. Where all the costs are to be borne by the physician, charges heretofore established for such services by agreement between the physician and the hospital may be acceptable as reasonable charges for purposes of the supplementary medical insurance program, but they will require adjustment either upward or downward if the hospital has been bearing a cost significantly greater or less than its share of the proceeds of such charges.

(b) *Billing for physician services.* (1) The objective in determining reasonable charges where the physician bills patients directly is the same as that expressed in § 405.485(a); to bring about as little change, as possible (in the normal case) in the compensation the physician receives for his services in the hospital. Where the physician bills the patient directly, costs of operating the hospital department which are borne by the physician will be reflected in his reasonable charges which are compensable under the supplementary medical insurance program; the hospital will receive reimbursement through the hospital insurance program for

those costs, if any, which it incurs. Where, however, a hospital initially pays some or all of the operating expenses of a hospital department (e. g., pays the salaries of nonprofessional personnel and purchases supplies and equipment), even though subsequently those items and services for which it pays the operating expenses are furnished for the use of the physician in return for an agreed upon payment by the physician to the hospital, such operating costs are reimbursable under the hospital insurance program as hospital costs, and are not to be reflected in the reasonable charges of the physician. Any payments received by the hospital under such an arrangement shall be treated as a reduction of allowable costs of the hospital reimbursable through the hospital insurance program.

(2) Where a hospital has been receiving, as its portion of the receipts for such services, significantly more or less than the costs the hospital has incurred in the provision of the services, this excess or shortage should not be transferred from the hospital to the physician merely because he decides to bill his patients directly. Since payment to the hospital is made on the basis of its reasonable costs for all hospital services, the transfer of such excess or shortage to the physician necessarily would alter the total cost of patient hospital and medical care—a result which the legislation was not intended to bring about. The reasonable

Reimbursement Manual, HIM–15, (hereafter "the Manual") § 2108.5A.1 and 2.[2]

## II. FACTS [3] IN 77–1062 AND PROCEEDINGS

Plaintiff San Jorge Hospital, a private proprietary corporation, is a 91-bed general, short-term, acute-care medical facility. It is a "provider of services" under Part A of the Medicare program.

In 1965, the hospital and Dr. Nelson Lugo Rigau, a physician-radiologist, entered into a five-year lease, subsequently renewed on a month-to-month basis, for the operation of the hospital's radiology department. Under the lease the hospital's obligations

charges of a physician who enters into a lease or similar arrangement with a hospital under which the physician assumes the costs of operating the department and bills the patients directly would be based upon the remuneration he received for his services immediately prior to the leasing arrangement plus his reasonable costs of operation, taking into account the hospital's costs experience in providing such services. Reasonable charges, so determined, would be subject to appropriate future adjustment to take into account changing economic factors. Reference back to the remuneration formerly received by the physician from the hospital as a factor in determining his reasonable charges under the lease or similar arrangement is required to give effect to the provisions of the statute which direct that consideration be given, in determining reasonable charges, to the customary charges generally made by the physician for similar services. Where no pattern of customary charges has been established for the physician's professional services to patients other than the compensation he received from the hospital for his services, such compensation would serve as the basis for establishing the customary charge.

**2.** § 2108.5 *Effect of Physician's Assumption of Operating Costs (Lease or Concession Arrangement).—*

A. *Where the Physician Bills Patients Directly.—*

1. *Basis of Reimbursement.—*Where a provider initially pays some or all of the operating expenses of a department (e. g., salaries of nonprofessional personnel, supplies and equipment), such operating expenses are reimbursable as reasonable costs to the provider even though the provider is subsequently reimbursed by the physician for the use of those items or services. Such operating expenses are not to be reflected in the reasonable charges of the physician. And payments received by the hospital under an arrangement where the physician leases a department should be treated as a reduction of allowable costs for purposes of reimbursement under the hospital insurance program. The application of this offset is not limited to the allowable costs for a single department. If the Medicare portion of the income realized by a hospital exceeds the Medicare portion of allowable costs of such department, any remaining income should be applied as a reduction of Medicare reimbursable costs for the other departments of the hospital. Where a provider-based physician, himself, bears some or all of the costs of operation of a department, the costs which he bears may be reflected in his customary charges and considered in determining reasonable charges under supplementary medical insurance. However, these costs will need to be adjusted upward or downward where the provider has been bearing a cost significantly more or less than its own share of the proceeds of such charges, and the determination of reasonable charges should consider such adjustments.

2. *Determination of Reasonable Charges.—*

a. The customary charges of a physician who enters into a lease or similar arrangement with a provider, under which the physician assumes the costs of operating a department and bills patients directly, should be based upon: (1) the remuneration he received for his professional services to patients immediately prior to the leasing arrangement; and (2) his reasonable costs of operation, taking into account the provider's cost experience in providing such services. References to the remuneration formerly received by the physician from the provider are required because consideration must be given to the customary charges generally made by the physician for similar services. If, at the time the lease or similar arrangement became effective, the physician had no pattern of customary charges for his professional services to provider patients other than the compensation he received from the provider, such compensation serves to establish his customary charges.

b. Where a provider has been receiving, as its portion of the receipts for services rendered by a department, significantly more or less than the costs the provider has incurred in providing these services, this excess or shortage should not be transferred from the provider to the physician merely because he decides to bill directly. Such transfer would alter the total cost of patient hospital and medical care, a result which would conflict with the intent of the Medicare legislation.

\*     \*     \*     \*     \*     \*

3. The facts here recited are not in dispute. They are drawn from the Secretary's findings in the earlier numbered of the two cases here on appeal.

are to provide space for a radiology department, related utilities and janitorial services, specified equipment, and billing for radiology services provided to inpatients without health insurance. The physician's obligations are to provide the other necessary equipment and supplies, to employ all professional and nonprofessional personnel, to bill all outpatients and those inpatients with health insurance, and to assume all other costs relevant to the operation of the radiology department. The physician pays as rent a percentage of gross revenues from diagnostic services.

In fiscal year 1973 the hospital received from the radiology department $64,671 rent and "incurred x-ray operating costs in the amount of $19,210. . . . [The hospital] initially charged [those] expenses directly to the x-ray department." (A. 9). In fiscal year 1974 the rent was $63,725, the operating costs were $23,319, and the hospital reported in the same way as it had in 1973.

Upon auditing the hospital's costs reports for 1973 and 1974, Blue Cross of Florida (BCF), acting as fiscal intermediary, used for the 1973 accounting the $64,671 rent to offset the $19,210 x-ray department costs, and then used the $45,461 balance to offset part of the hospital's general service department costs. The same procedure was adopted with respect to the 1974 accounting—the relevant figures being $63,725 rent, $23,319 x-ray department costs, and $40,406 balance applied to general service department costs. Those adjustments reduced the hospital's reimbursements under the Part A Medicare program by $12,514 for 1973 and by $11,789 for 1974.

The hospital sought review of the intermediary's decision with respect to its 1973 and 1974 cost reports before the Departmental Provider Reimbursement Review Board (the Board). The Board reversed the intermediary's adjustment, finding that the portion of the hospital's rent that exceeded the hospital's share of the costs of the x-ray department could not be offset against the other allowable costs of the hospital.

The Administrator of the Health Care Financing Administration, to whom the Secretary of HEW delegated authority to review Board determinations, reversed the Board's decision on May 20, 1977. He concluded that, under 42 CFR § 405.486(b)(1), the rental payments made by the radiologist must be used to eliminate the hospital's share of the costs of the x-ray department and then to reduce the hospital's total allowable costs reimbursable through the Part A Medicare program.

On July 22, 1977 the hospital filed a complaint (Civil Action No. 77–1062) in the United States District Court for the District of Puerto Rico, praying that the Secretary's May 20, 1977 final decision with respect to its 1973 and 1974 cost reports be reversed.

On February 21, 1978 the Secretary moved for summary judgment in that case.

### III. ALLEGATIONS AND PROCEEDINGS IN 78–1593

On August 18, 1978 the hospital filed in the Puerto Rico District Court another complaint (Civil Action No. 78–1593). The complaint alleged facts with respect to the hospital and the lease which parallel the findings in 77–1062. It then alleged that in adjusting the hospital's 1976 allowable costs to determine its rights to reimbursement under the Medicare A program, the Blue Cross of Florida, as fiscal intermediary, had offset $35,338 of the 1976 rental income which the hospital had received from its leased x-ray department against the hospital's general service department costs. However, the complaint did not allege that the hospital had sought review of this adjustment before the Board. Nonetheless, the complaint prayed for a judicial order declaring the adjustment of its 1976 allowable costs to be illegal.

On November 21, 1978 the Secretary moved to dismiss the complaint in Civil Action No. 78–1593 for want of subject matter jurisdiction.

On December 14, 1978 the District Court granted the hospital's motion for consolidation of Civil Action No. 78–1593 with Civil Action No. 77–1062.

## IV.  THE DISTRICT COURT'S OPINION AND JUDGMENTS

Being of opinion that in 78–1593 the hospital had not satisfied the statutory prerequisites for judicial review under 42 U.S.C. § 1395oo (f), and that in 77–1062 the hospital's claim must be denied on the merits because the Secretary's decision was warranted by what is now 42 CFR § 405.-486(b)(1), the District Court entered on February 23, 1979 judgment for the defendant in both Civil Action No. 77–1062 and Civil Action No. 78–1593.[4] March 19, 1979 plaintiff hospital filed its notice of appeal to this court.[5]

## V.  THE JURISDICTIONAL ISSUE IN 78–1593

██ We affirm the District Court's judgment dismissing the complaint in 78–1593 for the reason given by that court. The relevant portion of 42 U.S.C. § 1395oo (f) provides:

A decision of the Board [Provider Reimbursement Review Board] shall be final unless the Secretary [of Health, Education and Welfare], on his own motion, and within 60 days after the provider of services is notified of the Board's decision,

4. On February 23, 1979 the District Court executed in duplicate a summary judgment bearing the file symbol "Civil No. 77–1062 consolidated with Civil No. 78–1593." The judgment stated "This case . . . is hereby dismissed." The clerk of the district court placed a copy of that judgment in each file. Someone struck out of the copy in the 77–1062 file the reference to 78–1593, and in the 78–1593 file the reference to 77–1062.

5. The notice of appeal (A. 76), bearing the following heading "Civil Action No. 77–1062 consolidated with Civil Action No. 78–1593," states that plaintiff "appeals . . . from the . . . order and final judgment entered on the 20th day of February, 1979."

We treat this notice of appeal as being from the two judgments entered on February 23, 1979 in, respectively, Civil Action No. 77–1062 and Civil Action No. 78–1593.

6. We cannot pass without mention, a point not raised by counsel, respecting the jurisdiction of the district court with respect to Civil Action No. 77–1062. That court's jurisdiction to hear this case is claimed to rest upon 42 U.S.C. § 1395oo (f) which provides that "the provider of services may obtain a review of such deci-

reverses or modifies (adversely to such provider) the Board's decision. In any case where such a reversal or modification occurs the provider of services may obtain a review of such decision by a civil action commenced within 60 days of the date he is notified of the Secretary's reversal or modification. . . .

In 78–1593 the complaint does not allege that there has been any decision by either the Provider Reimbursement Review Board or the Secretary of HEW. It does not even allege that plaintiff ever presented to the Board or the Secretary any claim with reference to the hospital's cost reporting for the only period covered by the complaint—the year 1976.

The District Court correctly concluded that it lacked jurisdiction of the complaint. *Rhode Island Hospital v. Califano*, 585 F.2d 1153, 1161 (1st Cir. 1978).

## VI.  THE MERITS [6] IN 77–1062

██ In 77–1062 plaintiff challenges the Secretary's statutory and constitutional authority to require it to set off rental payments received from the hospital's leased radiology department against the hospital's

sion [by the Secretary] by a civil action commenced within 60 days of the date he is notified of the Secretary's reversal or modification" of the Board's decision.

We construe that statutory text as meaning that a provider is not notified of the Secretary's reversal or modification until he receives notice of that decision.

Neither plaintiff's complaint—dated July 22, 1977 but not filed until July 26, 1977 (A. 1)—nor anything we have seen in the record informs us when the hospital was notified of the Secretary's May 20, 1977 decision. However, we learn from item 0001 in the original papers transmitted to us that it was not until May 23, 1977 that HEW's attorney mailed from Baltimore to the hospital's counsel in Santurce, Puerto Rico the Secretary's opinion. This court, in the light of the failure of the parties to raise any jurisdictional issue, takes judicial notice that mail from Baltimore to Puerto Rico takes at least four days in transit. If plaintiff was not notified of the Secretary's decision until May 27 or some later date its complaint filed July 26 was within 60 days after it received notice of the Secretary's decision and met the time limit set by 42 U.S.C. § 1395oo (f).

general service department's costs, reimbursable under Medicare A.[7]

The Secretary based the challenged offset on his interpretation of the fourth sentence of 42 CFR § 405.486(b)(1) which provides:

Any payments received by the hospital under such an arrangement shall be treated as a reduction of allowable costs of the hospital reimbursable through the hospital insurance program.

The Secretary's interpretation is set forth in Manual § 2108.5A.1 which provides:

Any payments received by the hospital under an arrangement where the physician leases a department should be treated as a reduction of allowable costs for purposes of reimbursement under the hospital insurance program. *The application of this offset is not limited to the allowable costs for a single department.* If the Medicare portion of the income realized by a hospital exceeds the Medicare portion of allowable costs of such department, any remaining income should be applied as a reduction of Medicare reimbursable costs for the other departments of the hospital. [Emphasis added]

We now consider whether the Act gave the Secretary authority to apply the regulation, as thus interpreted, to accomplish the offset here challenged.

■ The Secretary has no authority directly over rental payments as such. However, the Social Security Act gives him authority to adopt regulations (42 U.S.C. § 1395x(v)(1)(A)) with respect to the allowance of a hospital's reimbursable costs, (42 U.S.C. § 1395f(b)) and a physician's reimbursable costs (42 U.S.C. § 1395*l*). Thus the Secretary may allow or refuse to allow, in whole or in part, a relevant rental payment as part of a reimbursable cost. He may also reduce an otherwise reimbursable cost by the amount of a relevant rental payment received.

In considering the relevance of revenues to costs an indispensable first step is to determine what is the unit whose costs are being scrutinized. In the instant case, for the purpose of reimbursement of costs, the radiology department is an "ancillary service" of plaintiff's hospital and as such is in a unit separate[8] from the general service department which is among the hospital's "routine services."

■ Where there are separate units for cost accounting Medicare has always recognized that it is a fundamental principle of correct cost accounting that revenues engendered by costs of one unit are ordinarily not to be set off against costs of another unit. (A. 15, par. 1). This principle is a corollary of the requirement in § 1861 of the Social Security Act, 42 U.S.C. § 1395x(v)(1)(A) that regulations shall make certain that "the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be

---

**7.** Plaintiff does not challenge the Secretary's set off of rental payments against the radiology department's reasonable costs, inasmuch as that set off avoids double payment to the hospital.

**8.** The Board (A. 15, par. 1), the Secretary (A. 39, fdgs. 7 and 8, conc. 2), and the counsel's briefs assume that the departments are separate units for the purposes of cost accounting. Our reading of the regulations supports this assumption.

42 CFR § 405.452(c)(1) provides that "Any hospital having less than 100 beds . . . must use the Combination Method of apportionment" in its "Determination of cost of services to beneficiaries." Section 405.404(a)(2) states that "the Combination Method necessitates cost finding . . . to determine the division of the provider's total allowable costs

between 'routine services' and aggregate 'ancillary services.'" X-ray services are treated as not being routine services. See § 405.452(d)(2) and the example of appropriate accounting for Hospital A set forth in § 405.452(e).

The rental payments to plaintiff were earned by costs of the "aggregate services" of the hospital including the x-ray department, and in the instant case the Secretary seeks to apply part of the rental payments as an offset to "routine services" including the "general service department."

We need not address a cost accounting issue on which the Secretary and the Board disagreed: that is, whether the radiology department should be treated as a *non-allowable* cost center. (A. 39). We assume, without deciding, that the Secretary was correct in treating the radiology center as an allowable cost center.

borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs."

An offset of rent received by the radiology department against reimbursable costs of the general service department marries two departments which 42 CFR §§ 405.-404(a)(2), 405.452(c)(1) and 405.452(d)(2) have put asunder. See footnote 8, *supra.* It is an offset which is so contrary to fundamental accounting principles that, unless specially justified, it is arbitrary.

The Secretary claims that the offset is justified on equitable and policy grounds, not on ordinary accounting principles. He argues that this offset is equitable and consistent with the Act's policy because it protects the FSMIT Fund created by Medicare B from paying more than the Act and the regulations authorize. These are the steps in the Secretary's argument: (1) the physician-lessee will include in his bills to Medicare B patients a charge attributable to his rental payments; (2) since such rental payments reflect not merely the hospital's costs but also the hospital's "profits," the physician-lessee's bill will also reflect hospital costs and profits; but (3) 42 CFR § 405.-486(b)(2) does not authorize the physician-lessee to be reimbursed for such part of his bill as reflects the hospital's profits; and, therefore (4) if Medicare B has actually paid the physician's bill reflecting the hospital's profits, the set off is justified as a method of recoupment; if not, it is justified as a prophylactic against inadvertent and almost undetectable excess payments by Medicare B.

■ The Secretary's argument starts with a doubtful premise. The Secretary has not shown us any regulation or formal interpretation which unmistakably authorizes a physician to include in his bill the rent he pays to a hospital. The third sentence of 42 CFR § 405.486(b)(2) states that "The reasonable charges of a physician who enters into a lease . . . would be based upon the remuneration he received for his services immediately prior to the leasing arrangement plus his reasonable

costs of operation, taking into account the hospital's cost experience in providing such services." Looked at in isolation, that third sentence of § 405.486(b)(2) seems to allow a physician to recover as one of his "reasonable costs of operation" at least that portion of the rent which reflected the hospital's costs. But the third sentence of 42 CFR § 405.486(b)(1) provides that "Where . . a hospital initially pays some or all of the operating expenses of a hospital department . . . even though subsequently those items and services for which it pays the operating expenses are furnished for the use of the physician in return for an agreed upon payment by the physician to the hospital, such operating costs . . . are not to be reflected in the reasonable charges of the physician." Plaintiff had initially borne as part of its operating expenses the cost of the premises and services furnished to the radiologist. Rental payments are the *quid pro quo* for the premises and services. Hence it would seem that the physician is forbidden to reflect any portion of his payments of rent in his bill. We find no way to reconcile the third sentence of 42 CFR § 405.486(b)(2) and the third sentence of 42 CFR § 405.486(b)(1). We might say that 42 CFR § 405.486 is invalid for ambiguity; or that § 405.486(b)(1) governs this case because it is an exception to the rule stated in § 405.486(b)(2), third sentence; or that the portion of the third sentence of § 405.486(b)(1) which we have quoted in this paragraph is arbitrary and lacking support in the Social Security Act because it denies a physician compensation for what is one of his reasonable costs and, hence, § 405.-486(b)(2) governs this case. We follow the last course and conclude that under 42 CFR § 405.486(b)(2) the physician is entitled to be compensated by Medicare B for that part of the rent which represents the reasonable costs of the hospital for the premises and services it furnishes, but is not entitled to be compensated by Medicare B for that part of the rent which reflects the profit of the hospital. The conclusion just stated, but not our reasoning, has been assumed to be

correct by the Secretary [9] and by courts which have construed 42 CFR § 405.486. *Dr. John T. MacDonald Foundation, Inc. v. Mathews,* 534 F.2d 633–637 (5th Cir. 1976), vacated 571 F.2d 328 (5th Cir. 1978); *Faith Hospital Ass'n v. United States,* 585 F.2d 474 (Ct.Cl.1978); *Lodi Memorial Hospital v. Califano,* 451 F.Supp. 651 (D.C.D.C.1978). *Vallejo General Hospital v. Weinberger,* CCH Medicare and Medicaid Guide, para. 28, 373 (N.D.Cal. February 9, 1977).

However, the mere fact that § 405.-486(b)(2) does authorize the physician to include in his bill charges reflecting his rent does not prove that Dr. Rigau's bills to his Medicare Part B patients did indeed reflect his rental payments to plaintiff. Cf. *Lodi Memorial Hospital v. Califano,* 451 F.Supp. 651, 677, col. 2 (D.C.D.C.1978). Even if we were to assume that the physician did include in his charges something on account of rent, we do not know whether the inclusion reflected the hospital's profits as well as its costs. Moreover, as the Board pointed out (A. 15–16), we do not know, and we are not offered any formula for ascertaining, what percentage of the physician's rental payments was charged to Medicare B patients, and what percentage to non-Medicare B patients.[10]

Furthermore, the offset might result in a recovery by Medicare A of sums already recovered by, or subject to recovery by, Medicare B. Medicare B has the right to recover from the physician any unreasonable charges which reflect the hospital's profit element in the rent. Cf. 42 CFR § 405.486(b)(2). See *Faith Hospital Ass'n v. United States, supra,* p. 480; *Dr. John T. MacDonald Foundation, Inc. v. Mathews,*

*supra,* p. 638; *Lodi Memorial Hospital v. Califano, supra,* p. 658. It would be inequitable to permit Medicare Part A to duplicate any such recovery.

The most important objection to the Secretary's equitable or policy argument is that he assumes that Medicare A and Medicare B are all one. But there is no such connection between Medicare A and Medicare B as to furnish a proper basis for setting off an excess payment made by Part B against an otherwise reimbursable cost of Part A. Medicare A and Medicare B are two different programs which have different purposes and, to some degree, different agencies of administration. Payments of Part B claims come from the FSMIT Fund; payments of Part A claims come from a wholly different fund with wholly different beneficiaries. If the offset were allowed, there would be a totally unmerited enrichment of the Medicare A fund, without any mechanism for Medicare A to transfer the unmerited enrichment to the FSMIT Fund. (A. 15–16).

The Secretary defends the offset on the ground that it will discourage hospitals from oppressive leasing arrangements which ultimately inflate patients' medical costs. But the Secretary has no statutory power to limit medical costs but only to limit reimbursement of costs, 42 U.S.C. § 1395*l*. The Secretary may not control rents charged by a hospital or any other landlord. His power is to refuse to reimburse physicians for any excessive rents which they pay.

Finally, the Secretary relies on the following quotation from the Court of Claims' opinion in a parallel case, *Faith Hospital Ass'n v. United States, supra,* at p. 482:

9. See A. 34 for the Secretary's reference in his opinion in this case to 20 [now 42] CFR § 405.486(b)(2). At page 16 of the brief filed in this court by the Secretary he acknowledges that "lessee-physicians . . . will, of course, treat . . . rental payments as an additional operating expense to be reflected in their reasonable charges to the Part B program."

If the physician-radiologist-lessee is not entitled to include in charges to his Medicare B patients any fraction of the rent, there would be little basis for the Secretary's chief conten-

tion in this court: to wit, that in order to protect Medicare B's FSMIT Fund from an overpayment to the physician it is appropriate to use any excess rental payments to the hospital as an offset to its general service department costs.

10. As the Board noted, (A. 15–16), it was not merely arbitrary but presumptively wrong to assume that the percentage of non-Medicare patients among the hospital's patients is also the percentage of non-Medicare B patients among the radiologist's patients.

Plaintiff, by changing the form, but not the substance, of the relationship between the hospital and the doctors in the departments, would have Medicare's obligation change to permit reimbursement not only of the operating expenses of the hospital and of the monies paid to and retained by the doctors but also a profit factor charged by the hospital as its fee for granting the doctors a monopoly in their areas of specialization. Such an excess charge is obviously inimical to the statute's purposes, and a regulation which purported to allow it would be suspect.

We disagree with that analysis. Neither Medicare A nor Medicare B is obliged to pay anything on account of the hospital "profit" on the lease. Medicare A pays no one anything on account of the rent charged the physician. Medicare B is obliged to pay only the hospital cost factor not the hospital profit factor in any charges made by the physician. 42 CFR § 405.-486(b)(2).

Our conclusion is that the application of 42 CFR § 405.486 by BCF and the Secretary to reduce plaintiff's otherwise reimbursable costs of its general service department by a portion of the rental payments plaintiff received from Dr. Rigau was invalid because it was arbitrary. That application was not authorized by any provision of the Social Security Act relied upon by the Secretary. We need not decide whether it was also in violation of plaintiff's provider contract with the Secretary. Nor need we decide whether it was also a deprivation by an official agency of the United States of plaintiff's property rights under the contract without the due process of law guaranteed by the Fifth Amendment to the United States Constitution.

There having been in the District Court no motion by plaintiff for summary judgment, plaintiff is entitled merely to have the judgment for defendant reversed.

*Judgment in 77–1062 reversed for further proceedings not inconsistent with this opinion. Judgment in 78–1593 affirmed.*

LEVIN H. CAMPBELL, Circuit Judge (concurring).

I fully concur in the court's comprehensive and excellent analysis, and would only emphasize the following.

First, I find it particularly significant that the Secretary nowhere justifies offsetting the hospital's leasing profit against its general costs as being a necessary or proper way to determine the hospital's "reasonable cost" of caring for Medicare A patients. *See* 42 U.S.C. § 1395x. Rather the Secretary justifies the offset in terms of its being a kind of windfall profits tax related to presumed excessive Medicare reimbursement of radiologists under Part B. Had the Secretary offered rational justification for the offset in terms of his authority to determine "reasonable cost" under Part A, I would have gone a considerable distance to accept his justification. Matters of accounting, unless they "be the expression of a whim rather than an exercise of judgment," are for the agency. *American Telephone & Telegraph Co. v. United States,* 299 U.S. 232, 237, 57 S.Ct. 170, 172, 81 L.Ed. 142 (1936). But no principle is here articulated that one factor in a rational formula for arriving at the cost of caring for Medicare A patients would be to deduct radiology department profits.

Second, I do not read this court's opinion as necessarily precluding some rational method for recapturing that portion of the leasing profits as is attributable to the Medicare B patients of treating radiologists, *cf.,* at page 481, *Faith Hospital Association v. United States,* 585 F.2d 474 (Ct.Cl.1978). In the present situation, however, there are simply too many disparities to justify the mechanism in use. The Secretary's formula recaptures profits on the basis of the *hospital's* Medicare population, which may or may not be proportionately the same as the radiologists' Medicare population. Furthermore, as Judge Wyzanski demonstrates, under the Secretary's procedure the offset benefits the wrong fund; excessive Medicare B reimbursement to radiologists should be returned to the fund being held for Part B of the program, a fund deriving from

sources different from the Medicare A fund.

Still, I would not read our opinion as preventing the Secretary from using practical means to control overcharges. The Medicare legislation gives the Secretary broad powers to determine the reasonableness of charges. The Secretary is not at the mercy of hospitals and physicians who seek unwarranted reimbursement, and retains a large reservoir of express and implied power to adopt rational requirements that guard against waste and fraud. Such regulations may include reasonably based presumptions and policy determinations reflecting the Secretary's judgment as to what is required to make the program work. Here one can understand the difficulty that led to the present attempted solution. Even in an era of computers, it is probably impractical for the Part B intermediary to screen the radiologists' bills in terms of the leasing hospital's actual costs. The Medicare B intermediary is unlikely to have ready access to the hospital's books, and, even if it does, the practicalities disfavor effective utilization of this information in reviewing myriad individual bills which come from the physician, not the hospital. Such considerations led the Secretary into the present system, which catches the real villain (if there is one)—the hospital—at a time when its defenses are down and its books on the table. The problem is, the link between the assumed Medicare B overpayments and the Medicare A exaction is too tenuous—not to mention that the benefit of the offset will accrue to the wrong account. These fatal flaws do not signal, however, that a more finely tuned system aimed at accomplishing a similar end will be doomed to failure.